## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| HARBOR COMPLIANCE LLC, | : |
| Plaintiff, | : |
| | : |
| vs. | : |
| | : CIVIL ACTION NO. _____ |
| NIZAR YAGHI and | : |
| COMPLIANCE EXPRESS, LLC, | : **JURY TRIAL DEMANDED** |
| | : |
| Defendants. | : |
| | : |

## CIVIL ACTION COMPLAINT

Plaintiff, Harbor Compliance LLC ("Harbor Compliance" or the "Company"), by and through its undersigned attorneys, Royer Cooper Cohen Braunfeld LLC, hereby files the following Civil Action Complaint against Defendants, Nizar Yaghi ("Yaghi") and Compliance Express, LLC ("Compliance Express") (collectively, the "Defendants"), and avers as follows:

## PRELIMINARY STATEMENT

1. Harbor Compliance seeks to redress Defendants' willful and malicious theft and use of the Company's **most sensitive** confidential information and trade secrets, with which Yaghi was entrusted in his top-level role as Harbor Compliance's Vice President of Operations and a member of the Company's Executive Management Team.

2. Yaghi has already used Harbor Compliance's confidential information and trade secrets to get a "head-start" on establishing a directly competitive business – Compliance Express – and to avoid spending all of the time and money that Harbor Compliance invested over more than a decade to differentiate itself from and gain a competitive edge over others in the market.

3. Further, in light of his former top-level role and access to Harbor Compliance's confidential information and trade secrets, Yaghi will inevitably continue to use and/or disclose

the Company's confidential information and trade secrets in his current position as the owner and Chief Executive Officer of Compliance Express – once again, a direct competitor, which Yaghi was only able to get up and running by copying Harbor Compliance's confidential business plans.

4.      Indeed, as explained further below: (i) due to Yaghi's unauthorized retention of Harbor Compliance's confidential information and trade secrets, including, but, not limited to, those contained in a detailed 85-page Management Presentation that was created **<u>exclusively</u>** for potential investors subject to strict non-disclosure obligations; and (ii) in light of Yaghi's ongoing campaign to interfere with the Company's business relationships, coupled with his knowledge of, among other things, Harbor Compliance's pricing models and strategies, Defendants are uniquely positioned to continue causing Harbor Compliance to sustain immediate and irreparable harm by continuing to solicit and attempt to lure away the Company's clients.

5.      Accordingly, to protect its legitimate business interests and prevent any further harm, Harbor Compliance comes to this Honorable Court, seeking permanent injunctive relief and monetary damages pursuant to the Defend Trade Secrets Act, 18 U.S.C § 1836, *et seq*. (the "DTSA") and Pennsylvania Uniform Trade Secrets Act, 12 P.S. § 5301, *et seq*. (the "PUTSA"), as well as Pennsylvania common law.

<u>**THE PARTIES**</u>

6.      Harbor Compliance is a Delaware limited liability company with a business address located at 812 North Prince Street, Lancaster, PA 17603.[1]

7.      Yaghi is a citizen of Pennsylvania, residing therein at 1815 Hallowell Road, Plymouth Meeting, PA 19462.[2]

---

[1]  Harbor Compliance is formerly known as Harbor Compliance Business Corporation.

[2]  Yaghi also owns a home at 727 Beech Court, Bridgeport, PA 19405.

8.     Compliance Express is a Pennsylvania limited liability company with a business address located at 1815 Hallowell Road, Plymouth Meeting, PA 19462.

## JURISDICTION AND VENUE

9.     This Court maintains subject matter jurisdiction over the instant action pursuant to 28 U.S.C. § 1331 because Harbor Compliance asserts a cause of action against Defendants under the DTSA, a federal statute, and the Court maintains supplemental jurisdiction over Harbor Compliance's Pennsylvania state law claims pursuant to 28 U.S.C. § 1367(a).

10.     This Court has personal jurisdiction over Defendants because: (i) they both reside in Pennsylvania; and (ii) and their contacts with the Commonwealth of Pennsylvania are sufficient for the exercise of jurisdiction over them satisfying the standard set forth by the U.S. Supreme Court in *International Shoe Co. v. State of Washington*, 326 U.S. 310 (1945).

11.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b)(1) and (2) because: (i) this action arises from Defendants' employment with and tortious conduct directed at Harbor Compliance, which is based in Lancaster County, and thus, a substantial part of the events underlying Harbor Compliance's claims occurred within this Judicial District; and (ii) Yaghi resides in Montgomery County, PA.

## FACTUAL BACKGROUND

**A.     Harbor Compliance's Business and Yaghi's Former Position of Trust as Vice President of Operations and a Member of the Executive Management Team.**

12.     Harbor Compliance is a leading provider of compliance solutions for organizations of all types and sizes, and provides charitable solicitation registration and renewal, fundraiser registration, corporate registration, registered agent, registration for cause marketing, business formation and document filing, annual reporting, foreign qualification, and tax registration

services (collectively, the "Services") to, *inter alia*, non-profit organizations, as well as architecture, construction, engineering, and law firms in and throughout the U.S.

13.    Founded by a team of regulatory specialists and technology trailblazers, to date, Harbor Compliance has helped more than 40,000 clients apply for, secure, and maintain entity, licensing, and tax compliance solutions across all industries.

14.    The Services sold by Harbor Compliance are not subject to public bidding, and instead, it is necessary for Harbor Compliance to rely upon targeted pricing and the customer relationships that it is has spent substantial amounts of time and resources to develop and maintain over the years to have any success in the marketplace, which is highly competitive.

15.    With respect to pricing, in particular, the Company has invested and continues to invest substantial resources to conduct market research and evaluate corresponding analytics in order to model its current and future strategies and stay competitive in the marketplace.

16.    Effective December 31, 2024, Yaghi became Harbor Compliance's Vice President of Operations, an executive-level role.

17.    A copy of Harbor Compliance's December 31, 2024 offer letter to Yaghi is attached as Exhibit 1 (the "Offer Letter").

18.    As shown by his resume submitted to Harbor Compliance, a copy of which is attached as Exhibit 2, before joining the Company, Yaghi had no experience working in the compliance solution industry, or with providing any of the Services.

19.    Nonetheless, based upon Yaghi's representation that he possessed significant prior experience as an operations manager in general, Harbor Compliance took a chance and hired him.

20.    Given his executive-level role, Yaghi received a substantial base salary of $250,000 per year, plus benefits and eligibility for incentive compensation.

21.     As set forth in his Offer Letter, Yaghi was an at-will employee, who was required to "abide by and adhere to the Company's rules and standards" and was "subject to all applicable employment and other policies of the Company." (Ex. 1 at p. 1).

22.     In his role as Vice President of Operations, Yaghi was granted significant authority to oversee and ensure that the Company effectively executed on core financial and operational processes, as well as data integrity.

23.     Yaghi also served as a member of the Company's Executive Management Team along with Harbor Compliance's CEO, President, Vice President of Finance & Analytics, Director of Sales and Marketing, and Vice President of Product and Technology.

24.     The Executive Management Team is comprised of Harbor Compliance's highest level managers, and, during Yaghi's tenure at the Company, was entrusted with **<u>exclusive</u>** access to Harbor Compliance's most sensitive business information, including, in particular, information provided to potential investors and which: (i) was and is subject to non-disclosure agreements; and (ii) was not shared with employees of Harbor Compliance other than the Executive Management Team, much less any competitors of Harbor Compliance.

25.     In fact, it was only because he served as a member of the Executive Management Team that Yaghi was entrusted with confidential information and documents related to potential investors in the first instance, and Yaghi was also privy to private meetings and discussions between the Executive Management Team and those potential investors – all of which, once again, were subject to strict non-disclosure agreements, something that Yaghi certainly knew and knows.

**B.**     **<u>Harbor Compliance's Trade Secrets and Written Policies and Procedures.</u>**

26.     Solely for Harbor Compliance's benefit and the purpose of performing his duties as the Company's Vice President of Operations and an Executive Management Team member,

Yaghi was entrusted with access to files and materials containing the Company's non-public: (i) financial and sales records, reports, and projections; (ii) current and future pricing models and information; (iii) marketing (including market research data and analytics), business, and expansion plans and strategies; (iv) proprietary software and product development plans and strategies; and (v) customer and prospective customer lists, as well as compilations and analyses regarding customer needs and Services purchased by customers (collectively, the "Trade Secrets").

27.    During his employment with Harbor Compliance, Yaghi was required to hold the Trade Secrets in strict confidence, for the sole benefit of Harbor Compliance, and not for any other person or entity, especially not any competitor(s).

28.    At no time was Yaghi authorized to use any personal electronic devices and/or accounts to perform any work on behalf of Harbor Compliance.

29.    Rather, Yaghi was required to comply with Harbor Compliance's written policies and procedures, including the Company's written policies that govern the proper handling of confidential information and Trade Secrets.

30.    Upon becoming employed, Yaghi received and acknowledged that he reviewed the Company's Employee Handbook, relevant portions of which are attached as Exhibit 3.

31.    The Company's Employee Handbook provides, in pertinent part:

A.    **Confidential Information**

**Definition**

Harbor Compliance's clients and other parties with which the Company does business entrust the Company with important information relating to their businesses. The ongoing success of the Company necessarily depends on the protection of all Confidential Information. The term **'Confidential Information'** includes (a) all information about or concerning a client that an employee learns or obtains as a result of providing services to or interacting with a client while in the employ of the Company; and (b) all information

concerning the operations of the Company including, but not limited to, markets, marketing, ideas, processes, technology, techniques, methods, systems, know-how, finances, pricing, strategy, costs, plans, dealings, arrangements, objectives, strategies, and trade secrets. The term 'trade secrets' includes any information, knowledge, or matter that constitutes a "trade secret" under the Uniform Trade Secrets Act, 12 Pa.C.S.A. § 5302.

Information that falls within the definitions provided in the preceding paragraph will be considered Confidential Information regardless of who or what created the information, regardless of the form or medium in which the information is communicated, disclosed, transmitted, stored, or maintained, and regardless of when (whether before, simultaneous with, or after your receipt of this Handbook) the information was or is communicated, disclosed, or transmitted.

### Creation and Ownership of Confidential Information

The Company is the sole and exclusive owner of all Confidential Information, even Confidential Information that you the employee developed or helped to develop and regardless of when such development took place. *This means that all materials developed, produced, or in the process of being developed or produced during the course of your employment with the Company are the property of the Company.*

### Use of Confidential Information

As an employee of Harbor Compliance, you will be exposed to Confidential Information. You agree you will not use or disclose Confidential Information for any purpose except to the extent: (a) necessary to provide services to a client of the Company, (b) necessary to inform subcontractors or affiliates of the Company who have an actual need to know about the Confidential Information in order to facilitate the subcontractor or affiliate's performance of services for a client of the Company, or (c) as otherwise directed by the Company. *Violation of this provision would most likely result in your immediate termination of employment and possibly more serious legal penalties.*

*The Company sincerely hopes that its relationship with you will be long-term and mutually rewarding. However, your employment with the Company assumes an obligation to maintain the secrecy of*

> *Confidential Information indefinitely, even after you leave the Company's employ.*

(Ex. 3 at pp. 25 – 26) (emphasis added).

32.    The Employee Handbook further provides:

**B.    Effects of Termination**

> *Upon termination of your employment, you must promptly return to the Company any and all originals and copies of any Confidential Information, regardless of the format that the Confidential Information is in, and any and all equipment, software, passwords, keys, or other Company property in your possession.* Your duty to safeguard Confidential Information continues indefinitely, even after you leave the Company's employ.

(Ex. 3 at p. 28) (emphasis added).[3]

33.    To further safeguard its Trade Secrets, in addition to the Employee Handbook, Harbor Compliance maintains a comprehensive IT Policy Handbook, relevant portions of which are attached as Exhibit 4.

34.    Harbor Compliance's IT Policy Handbook includes an "Acceptable Use Policy," which provides, in pertinent part:

**Responsibilities**

> Passwords should not be shared with another individual. They are intended for the authorized team member only.
> *Team members who transmit confidential information outside the organization should company with applicable regulatory requirements, customer requirements, and Harbor Compliance policies regarding the disclosure of confidential information to third parties.*
> Communications may be monitored and tracked without consent or advanced notice to the team member Retention and disposal of electronic communications should be in accordance with all Harbor Compliance data protection and privacy policies.

---

[3] Harbor Compliance updates its Employee Handbook, typically on an annual basis. However, all versions of the Employee Handbook include provisions to safeguard the Company's confidential information and Trade Secrets.

**Prohibited Uses of Communication Tools**

*Dissemination of confidential or protected information (i.e., trade secrets, team member personal information or financial data, customer information, etc.), except for approved business purposes.* Attempting to gain access to another team member's account, without permission.
Misrepresenting, obscuring, suppressing, or replacing a team member's identity.
*Sending confidential information over an open network (the Internet) without proper encryption.*
Transmitting messages with derogatory or inflammatory remarks about an individual's race, age, disability, religion, national origin, physical attributes or sexual preference

**Use of Personal Devices (BYOD)**

The use of a personal device for Harbor Compliance purposes should be limited to email and the Harbor Compliance messaging tool unless there is business justification and formal approval. *Personnel must not save Harbor Compliance data to any personal device.* Personnel are responsible for configuring their device to be in alignment with the device configuration settings specified in the next section of this policy…

(Ex. 4 at pp. 9) (emphasis added).

35.    Further, as set forth in Harbor Compliance's written Code of Conduct, a copy of which is attached as <u>Exhibit 5</u>, "[t]he confidentiality of proprietary information, and similar confidential commercially-sensitive information (i.e. marketing or business strategies/plans, software, client lists, etc.) about the Company or operations, or that of [its] clients, is to be treated with discretion and only disseminated on a need-to-know basis…" (Ex. 5 at p. 1).

36.    By implementing and enforcing the written policies contained in its Employee Handbook, IT Policy Handbook, and Code of Conduct, along with restricting access to its Trade Secrets by using password-protected electronic systems, networks, and e-mail servers, Harbor Compliance took and takes reasonable steps to safeguard and ensure that its Trade Secrets were

and are held in the strictest of confidence by its employees, including Yaghi, who, once again, was privy to the Company's most sensitive business information on the Executive Management Team.

37.    Indeed, Harbor Compliance has invested and continues to invest significant amounts of time (since 2012) and millions of dollars to develop and keep its Trade Secrets up-to-date, allowing it to maintain a competitive edge in the marketplace.

38.    And, if a competitor were to know Harbor Compliance's Trade Secrets, it would have a substantial unfair advantage over Harbor Compliance in the marketplace.

C.    **Yaghi's Termination for Cause, Harbor Compliance's Demand for Yaghi to Immediately Return All Company Files and Materials, and Yaghi's Additional Efforts to Coerce the Company into Paying Him Severance.**

39.    As noted above, despite his lack of prior experience with a business like Harbor Compliance, the Company gave Yaghi a chance.

40.    Unfortunately, however, Yaghi failed to carry out his duties as Vice President of Operations in a satisfactory manner.

41.    On September 3, 2025, due to his performance deficiencies, Yaghi was issued a written Performance Improvement Plan (the "PIP").

42.    The PIP provided Yaghi a two-month window in which he was to correct his performance-related shortcomings and included a mandated follow-up after one month to ensure performance objectives were being met.

43.    Instead of working to meet the goals set in the PIP, Yaghi immediately took paid time off, and, knowing that his days at Harbor Compliance were limited due to his performance issues, concocted a plan to extort the Company into paying him a severance based upon a threat to improperly interfere with the Company's potential investor relationships.[4]

---

[4] Shortly after Yaghi received the PIP, on September 5, 2025, Shannon Tierney ("Tierney"), resigned from her position as Project Manager in Harbor Compliance's Operations Department. Tierney reported directly to and worked closely

44.     As a result, Yaghi was terminated by the Company for cause, effective September 22, 2025 (the "Termination Date").

45.     A copy of Harbor Compliance's September 22, 2025 termination notice directed to Yaghi is attached as Exhibit 6 (the "Termination Notice").

46.     The Termination Notice provides, in pertinent part:

> In addition to the above, **no later than 3:00 p.m. on Wednesday, September 24, 2025**, you must return any and all Company property within your possession, including, but not limited to: (i) any and all keys and login / access credentials for any Company systems; *(ii) any and all electronic devices previously provided to you by the Company; and (iii) any files and/or materials containing any confidential information and/or trade secrets belonging to the Company, which, for the avoidance of doubt, includes any and all files and/or other materials that contain any information related to the due diligence process for a potential sale of Harbor Compliance's business.* **Failure to do so will result in legal action by the Company.**

(Ex. 6) (emphasis added).

47.     Thus, the Termination Notice makes clear that, as of the Termination Date, Yaghi was no longer permitted to access, use, and/or possess any of the Company's Trade Secrets, which, in his former role as the Company's Vice President of Operations, Yaghi was obligated to hold in strict confidence for the Company's exclusive benefit.

48.     Although Yaghi did return the Company laptop provided to him so that he could perform his job duties for Harbor Compliance, as explained at length below, the Company has now learned that, *for more than five (5) months after the Termination Date,* Yaghi, without any

---

with Yaghi, and, upon information and belief, Yaghi played a role in encouraging and/or including her to leave Harbor Compliance once he received the PIP. Subject to further investigation and discovery into this issue, Harbor Compliance reserves the right to assert additional claim(s) against Yaghi, including, but not limited to, for breach of the duty of loyalty that he owed to Harbor Compliance under Pennsylvania law.

authority to do so, **personally retained** Trade Secrets belonging to Harbor Compliance – all while he formed, began operating, and used Compliance Express to harm the Company's business.

49.     In addition to retaining Company's Trade Secrets for his competing business, which will be addressed at length below, after his termination, Yaghi also continued his efforts to coerce the Company into paying him a severance through improper means.

50.     First, on October 2, 2025, Yaghi caused the Council on American-Islamic Relations ("CIAR") to send a letter to Harbor Compliance's legal counsel, a copy of which is attached as Exhibit 7 (the "CAIR Letter").

51.     The CAIR Letter provides, in pertinent part:

> …We encourage you to resolve any issues with Dr. Yaghi, *or we will be forced to put out a call to our community regarding the treatment Dr. Yaghi is facing, which would entail a press release and a notification to our national network of media outlets, advocacy groups, and civil rights organizations.*
>
> *It is our expectation that the settlement will be finalized by October 6, 2025 or we will put a call out to our community.  Please contact Attorney Baird to settle…*

(Ex. 7 at p. 1) (emphasis added).

52.     Then, after the stated October 6, 2025 "deadline" in the CAIR Letter expired, the potential investors with which Yaghi was privy to meetings and discussions solely because of his former role on the Executive Management Team began to receive messages from "anonymous" e-mail addresses (the "Anonymous E-Mails").

53.     Samples of the Anonymous E-Mails are attached as Exhibit 8.

54.     By way of illustration, on October 18, 2025, the following message was sent to one of Harbor Compliance's potential investors:

> Hello – I received a tip that two executives from the harbor compliance executive team recently resigned due to concerns over

how the company is presenting key facts in connection with the
majority share sale process. You might want to reach out to Amanda
Schmitt and niece yagi [sic] to get the real scoop on what's going on.
*I am only doing this as a good Samaritan, I have no other interests
nor do I have any more information. I appreciate keeping this tip
confidential.*

(Ex. 8 at p. 1) (emphasis added).

55.     While he denies having sent them, the Anonymous E-Mails make specific reference

to Yaghi and were sent to prospective investors, the identities of which only members of Harbor

Compliance's Executive Management Team would have known, indicating the Anonymous E-

Mails were, in fact, sent by Yaghi or on his behalf.[5]

56.     Moreover, the Anonymous E-Mails align with Yaghi's overall efforts to extort the

Company into paying him severance by threatening to interfere with potential investors, and then,

when the CAIR Letter's stated "deadline" having expired, Yaghi carrying out those threats.

57.     In any event, neither the CAIR Letter nor the Anonymous E-Mails are the end of

the story, and, as set forth below, Yaghi's improper and deceptive conduct persists.

**D.     Yaghi's Retention of Highly-Sensitive Trade Secrets and Ongoing Efforts to
        Damage Harbor Compliance through Unfair Competition.**

58.     Once again, both in accordance with the Company's written policies and as set forth

in the Termination Notice, upon being terminated on September 22, 2025, Yaghi was required to

return any and all files and/or materials containing any "confidential information and/or trade

secrets" belonging to the Company.  (Ex. 6 at p. 1).

59.     In line with that obligation, Yaghi was specifically instructed that his obligation to

return any and all "confidential information and/or trade secrets" encompassed "any and all files

---

[5] It further appears that, in Yaghi's mind, if he misspelled his own name as "niece yagi," it would be less likely for
Harbor Compliance and/or its potential investors to suspect him.

and/or other materials that contain any information related to the due diligence process for a potential sale of Harbor Compliance's business." (*Id.*).

60.     However, in late January 2026, Harbor Compliance learned that Yaghi had formed Compliance Express and that he had been reaching out to clients of the Company to offer them charitable solicitation registration services – i.e., services that directly compete with the Services offered by Harbor Compliance.

61.     Upon learning about Yaghi's competing business, Compliance Express, Harbor Compliance undertook an investigation (the "Investigation") and discovered that, while he was still employed by the Company and undoubtedly knew that his performance was deficient, Yaghi began planning to form a competing business.

62.     For example, leading up to the PIP, on August 14, 2025, Yaghi used his Company-provided laptop to conduct a number of internet searches, as documented via the Spreadsheet attached as <u>Exhibit 9</u>:

> *how can I file a business formation*
> how can I register for charity solicitation
> how can i register for non profit solicitation
> how can I register for non solicitation

(Ex. 9 at p. 1) (emphasis added).

63.     Then, about a week later, on August 21, 2025, Yaghi used his Company-provided laptop to access and review the Company's "A-Player Dashboard," which includes non-public details regarding the Company's top-level employees and performers – information that would be very valuable to someone ready to start a competitive business and try to lure away talent.

64.     As part of the Investigation, the Company also came across Yaghi's LinkedIn Profile, a copy of which is attached as <u>Exhibit 10</u>.

65.     According to his own LinkedIn Profile, from "October 2025 – Present (6 months)," Yaghi has been the "Chief Executive Officer" of Compliance Express.  (Ex. 10 at p. 2).

66.     For his own description of Compliance Express, Yaghi's LinkedIn Profile provides, in pertinent part:

> -   Register:  Initial state-level charitable registrations for online or offline fundraising
>
> -   Renew:  Annual renewals and required filings in 40+ states = organized, scheduled, and tracked
>
> -   Recover:   Cleanup and reinstatement support for lapsed, missing, or rejected filings

(*Id.*)

67.     According to its website, https://www.compliance-express.com/ (the "Website"), Compliance Express specializes in "in helping nonprofits stay in good standing across 40+ U.S. states" and "[its] work focuses on registrations, renewals, and recovery filings—handled with clarity, accuracy, and disciplined operations."

68.     Printouts of the Website's various pages are attached as Exhibit 11.

69.     As demonstrated by Yaghi's own LinkedIn Profile and the Website, Compliance Express is a direct competitor of Harbor Compliance, and Yaghi is Compliance Express's owner and Chief Executive Officer.[6]

70.     In fact, on its Website, Compliance Express: (i) markets "state level charitable solicitation compliance" services and maintains "State Guides," which provide state-specific guidance on charitable solicitation requirements in each jurisdiction; and (ii) markets a book authored by Yaghi, which is called "Nonprofit Compliance, Simplified" and sold via Amazon. (*See* Ex. 11 at pp. 8 – 15).

---

[6] *See e.g.,* https://www.harborcompliance.com/business-compliance.

71.    This all begs the question – *how could Yaghi, who had no prior experience in the industry and was unable to perform his job as the Company's Vice President of Operations, create a competing business and write a book about nonprofit compliance so quickly?*

72.    Although the Company's Investigation remains ongoing and the full extent of the Defendants' misconduct remains to be seen, the answer has just recently come to light – *Yaghi has already, and, if he is not stopped by this Court, will continue to use Trade Secrets belonging to Harbor Compliance his own personal gain and the benefit of Compliance Express.*

73.    the Company just recently learned that, right after he received the PIP and just a couple of weeks before his termination, on September 4, 2025, Yaghi accessed his Company-provided laptop and deleted hundreds of files that he previously downloaded from Harbor Compliance's password-protected Google Drive and/or other system(s).

74.    As shown via the Spreadsheet attached as Exhibit 12, by their names alone, the files that Yaghi deleted on September 4, 2025 (collectively, the "Deleted Files") encompass Trade Secrets belonging to the Company, and Yaghi's mass deletion of those files indicates that he desired to conceal some type of wrongdoing.

75.    Perhaps, on their own, the Deleted Files would not amount to all that much, other than evidence that Yaghi wanted to cover his tracks for some reason.

76.    However, on February 12, 2026, Harbor Compliance's legal counsel delivered a cease-and-desist letter to Yaghi's counsel, Graham F. Baird, Esq. ("Attorney Baird"), a copy of which is attached as Exhibit 13 (the "Cease & Desist Letter").[7]

77.    In the Cease & Desist Letter, Harbor Compliance asked Yaghi to provide certain written assurances and execute a Declaration confirming that, *inter alia*, Yaghi has searched for

---

[7] For the sake of judicial economy, the exhibits to the Cease & Desist Letter are omitted.

and does not possess any files and/or materials "that relate to the Company's confidential information and trade secrets, including, but not limited to, the Company's financial and sales records and reports, information related to potential investors, pricing information, reference data or spreadsheets, marketing and business strategies and plans, trademarks and patents, software, product development plans, and/or customer or prospective customer lists." (Ex. 13 at p. 6).

78.     Harbor Compliance asked Yaghi to provide a signed copy of the requested Declaration by February 17, 2026.

79.     Neither Yaghi nor Attorney Baird responded by that date.

80.     Then, on February 25, 2026, Harbor Compliance's legal counsel received an e-mail from a different attorney, Samuel C. Wilson, Esq. ("Attorney Wilson") of Freundlich & Littman, LLC (the "F&L Firm").

81.     The pertinent e-mail exchanges between Harbor Compliance's counsel and the F&L Firm are attached as Exhibit 14.[8]

82.     Following a February 27, 2026 telephone conference between the Company's counsel and Attorney Wilson, during which Attorney Wilson represented that Yaghi did, in fact, possess certain (at that time) unidentified files belonging to Harbor Compliance, Attorney Wilson wrote the Harbor Compliance's counsel, in pertinent part:

> I further confirm that I will review any documents in my client's possession that have been presented to counsel for any purpose to determine if any contain information related to Harbor Compliance's financial information, sales records and reports, pricing information, reference data or spreadsheets, marketing and business strategies and plans, trademarks and patents, software, product development plans, and/or customer or prospective customer lists. To the extent any such related documents exist, we will return those documents to Harbor Compliance, per our agreement. Counsel may retain any documents related to prospective litigation, but Mr. Yaghi will not personally retain any

---

[8] Pursuant to the request of the F&L Firm, the entire e-mail thread is attached.

> documents related to the areas you have outlined.  *If Mr. Yaghi possesses any documents responsive to your requests, they will be returned by Wednesday, March 4, 2026.  Thank you.*

(Ex. 14 at p. 19) (emphasis added).

83.    Attorney Wilson then confirmed and clarified that he would ensure that [the F&L Firm] retain any materials and return *and return any Harbor Compliance materials in Mr. Yaghi's possession."* (*Id*. at p. 17) (emphasis added).

84.    In the meantime, while the F&L Firm was, per Attorney Wilson's confirmation, ensuring that any and all Company materials within Yaghi's possession were returned (now more than five (5) months after they should have been), Yaghi continued to solicit Harbor Compliance clients, including on February 27, 2026.

85.    On March 4, 2026, Attorney Wilson confirmed with Harbor Compliance's legal counsel, in pertinent part, that "*[he] had [his] client send [him] a link with the documents **he retained** from Harbor Compliance*" and that Attorney Wilson was "currently preserving those documents in a folder in [his] office."  (Ex. 14 at p. 12) (emphasis added).

86.    The next day, on March 5, 2026, after Harbor Compliance's counsel followed up for the documents that Yaghi admittedly *"retained from Harbor Compliance,"* Attorney Wilson wrote back as follows:

> *He doesn't have files like you are thinking.* I am speaking to my colleague, Greg, about this. Some documents he possesses are privileged communications with his attorney regarding his employment matter. *These are documents, not files that contain any Harbor Compliance client information.* I will speak to Greg and get back to you today so we can hopefully move forward. *He does not possess any of the files downloaded from the system to his work computer.* The only file-related item is Exhibit 3 from your letter to Mr. Graham, which includes the list of downloaded files. *That exhibit attached to the letter is the only thing that he has. He does not have the actual files referenced in that Exhibit or any other files*

> *in his possession.* I'm uncertain about what you want returned. ***He
> has nothing responsive to return to your requests…***

(*Id*. at p. 7) (emphasis added).

87.     Later that day, following another telephone discussion, Gregory Creed Littman,

Esq. ("Attorney Littman") of the F&L Firm, e-mailed Harbor Compliance's counsel and stated, in

pertinent part:

> …I will provide you with documents ***my client retained*** for his
> employment discrimination case to give to counsel.  I will also
> provide you with a draft of what my client is willing to attest to
> and what he requires in return.  As we discussed, if your client is
> not satisfied, they are welcome to take other action.  I do believe
> the Court will see this for what it is: retaliation for filing an
> employment discrimination claim and an attempt to use 'trade
> secrets' ***(aka benign documents)*** to compensate for your client's
> failure to obtain a noncompete clause.

(*Id*. at p. 3) (emphasis added).

88.     After: (i) representations from the F&L Firm that Yaghi "does not have the actual

files referenced in [the Cease & Desist Letter] or any other files in his possession" (Ex. 14 at p. 7);

and (ii) a baseless accusation that Harbor Compliance is attempting to use ***"benign documents"***

to "retaliate" against Yaghi for alleging "discrimination," on March 6, 2026, the F&L Firm finally

identified specific Company files that were, in fact, retained by Yaghi for almost five (5) months

after the Termination Date (collectively, the "Retained Files") – *all while he was busy creating,*

*operating, and soliciting Harbor Compliance clients through Compliance Express.*

89.     Even a cursory review of the Retained Files makes one thing clear – *they are very*

*far from "benign documents,"* like Attorney Littman said they were in his March 5, 2026 e-mail.

90.     In fact, as noted above, among the Retained Files, is an 85-page Management Presentation that Harbor Compliance, through its investment banker, created for and provided to potential investors in the summer of 2025 (the "Management Presentation" or "Presentation").[9]

91.     The Management Presentation is, in effect, a complete playbook on how to run a successful business in the Company's industry, and is replete with Trade Secrets, none of which would ever be shared with a competitor (nor the vast majority of Company employees).

92.     Yaghi was only entrusted with access to the Management Presentation because of his former role on the Executive Management Team and his privity to highly confidential and sensitive discussions between Harbor Compliance and potential investors in the summer of 2025.

93.     In other words, the Management Presentation was entrusted to an **extremely limited** number of Harbor Compliance employees, and only those employees at the highest level of the Company – i.e., the Executive Management Team.

94.     The very first page of the Management Presentation is conspicuously marked "*Private and Confidential.*"

95.     Moreover, right at its start, the Management Presentation provides:

> ***Each recipient agrees, and the receipt of this Presentation serves as an acknowledgment thereof, that the subject matter hereof and all of the information contained herein is of a confidential nature and that the recipient will treat such information in a confidential manner and will not, directly or indirectly, disclose or permit its affiliates or representatives to disclose any information regarding its receipt hereof or any information contained herein to any other person or reproduce, disseminate, quote or refer to this Presentation, in whole or in part, without the prior written consent of [Investment Banker].*** Notwithstanding anything herein to the contrary, prospective investors and each other party to any transaction discussed herein (and each employee, representative, and other agent of such party) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of any transaction discussed herein and all materials of any kind

---

[9] Given its highly-sensitive nature, the Management Presentation is not attached to this Complaint.

(including opinions or other tax analyses) that are provided to such party or such person relating to such tax treatment and tax structure. ***This authorization is not intended to permit disclosure of any other information including (without limitation) (i) any portion of any materials to the extent not related to the tax treatment or tax structure of the transaction, (ii) the identities of participants or potential participants in the transaction, (iii) the existence or status of any negotiations, (iv) any pricing or financial information (except to the extent such pricing or financial information is related to the tax treatment or tax structure of the transaction), or (v) any other term or detail not relevant to the tax treatment or the tax structure of the transaction.***

96.    Moving beyond its conspicuous confidentiality designations – which Yaghi no doubt read and knows exist – the Management Presentation amounts to a fulsome and detailed compilation of the Company's innerworkings.

97.    The following chart provides a summary of some of the non-public information contained in the Management Presentation:

| Page(s) | Non-Public, Confidential Information Regarding: |
|---|---|
| **6 – 9** | The Company's organizational structure, strategic vision, key milestones (both past and future), and proprietary software solutions / suite of products. |
| **11 – 17** | Harbor Compliance's market research data, development, and opportunities (both current and future, broken down by industry and client types), as well as Harbor Compliance's technological and Service differentiation strategies. |
| **19 – 30** | Harbor Compliance's proprietary software platform and products, automation approach, application overview, proprietary Compliance Core™ Database, infrastructure architecture, automation roadmap and strategy, and near-term technology initiatives, none of which are public knowledge. |

| | |
|---|---|
| **32 – 39** | The Company's strategic split of customer experience and operations, customer experience methodologies and strategies, sales and business development plans (current and future), historical, current, and future pricing models and information, new sales opportunities with related projections, revenue, profit, and profit margin projections, and customer attrition information and projections. |
| **42 – 65** | Harbor Compliance's extensive product roadmaps with customer utilization details for the Company's various products and Services. |
| **67 – 75** | Harbor Compliance's sales and marketing organization / structure, digital presence, marketing approach and strategies, future anticipated / targeted markets and customers, and future plans for expansion and specialization. |

98.     As illustrated by the above chart, the Management Presentation is full of Trade Secrets belonging to the Company, which Harbor Compliance invested many years and **millions of dollars** to develop and keep up-to-date, all put together into a neat 85-page document, and if obtained by a competitor, would put the Company at a significant disadvantage.

99.     In addition to the Management Presentation, for more than five (5) months after the Termination Date, Yaghi also personally retained: (i) a 27-page written transcript from a July 19, 2025 Executive Management Team Meeting; (ii) a 19-page document with written notes from a July 29, 2029 Executive Management Team Meeting; (iii) a 23-page written transcript from a September 3, 2025 Manager Meeting; and (iv) a 13-minute video from the Company's President, which, collectively, contain a substantial amount of highly-sensitive insider information related to the Company's business plans and strategies, customer initiatives and information, and sales and

financial projections, none of which are shared outside of the Company's Executive Management Team and/or managers, and certainly not with any competitor(s).

100.    Thus, when the F&L Firm represented that Yaghi had *"nothing responsive to return to [Harbor Compliance's] requests…"* and, then, that Yaghi possesses nothing but **"benign documents,"** the F&L Firm either had not yet reviewed the Retained Files or was mistakenly focusing solely on whether or not Yaghi possessed / possesses client lists, without considering the impact of what else he admittedly retained from Harbor Compliance.

101.    And, even though he now claims (through counsel) that he does not have any other Company files within his possession, given his prior access to the Company's most valuable and confidential Trade Secrets as a member of the Executive Management Team, Yaghi will inevitably use and/or disclose the Company's Trade Secrets going forward.[10]

102.    To that end, as of the time of this filing, Yaghi continues to solicit Harbor Compliance customers on behalf of Compliance Express, which, but for his access to the Retained Files – namely, the Management Presentation – Yaghi would never have been able to create, much less so quickly.

103.    Further, any contention that Yaghi merely kept the Retained Files for a purported "discrimination claim" strains credulity and ignores governing law.

104.    First, not only did Yaghi threaten to interfere with Harbor Compliance's potential investor relationships and then apparently carry out those threats via the Anonymous E-Mails, but he created a directly competing business almost as soon as he was terminated by the Company.

---

[10] As of the date of this filing, especially based upon Yaghi's efforts to conceal his wrongdoing (i.e., his actions with the Deleted Files), it is unclear how exactly Yaghi transferred the Retained Files to his personal electronic device(s) and/or account(s), but, his unauthorized retention – *alone* – constitutes misappropriation under the DTSA and PUTSA.

105.    The internet searches that Yaghi performed on August 14, 2025 also indicate that, even before his termination on September 22, 2025, Yaghi already had plans to form a competing business by exploiting his access to the Company's Trade Secrets *(which is exactly what he did)*.

106.    In short, the fact that Yaghi created a directly competitive business belies his very convenient excuse for violating Harbor Compliance's written policies and statutory rights, and his position simply does not pass the smell test.

107.    Second, Yaghi's apparent position that he was "allowed" to engage in self-help by keeping the Retained Files is backward.

108.    If Yaghi believes that he has a "discrimination" claim against Harbor Compliance, then it is his obligation to request relevant documents in discovery, so that the Company then has a chance to object and/or seek a protective order to safeguard its Trade Secrets.

109.    Yaghi did none of those things, and instead, just stole and kept what he wanted all while operating a competing business, Compliance Express.

110.    Given these circumstances, it is curious, *at best*, for Yaghi and/or his counsel to suggest that Yaghi's Company policy violations and unlawful conduct can somehow be excused because he intends to claim that the Company engaged in "discrimination" against him (even putting aside the fact that any such a claim is devoid of factual or legal merit in the first instance).[11]

---

[11]    Yaghi's misappropriation of the Company's Trade Secrets cannot amount to "protected activity" under Title VII or the PHRA, and, if anything, is after-acquired-evidence and yet another reason why his employment was justifiably terminated on September 22, 2025.  *See e.g., Johnson v. New Courtland, Inc.,* No. CIV.A. 13-4238, 2015 WL 894320, at *7 (E.D. Pa. Mar. 3, 2015) ("[a]lthough there is a dearth of authority on this issue within the Third Circuit, numerous other federal courts have agreed that the breach of employer confidentiality policies in order to obtain evidence for a discrimination suit does not constitute protected activity."); *Tassy v. Buttigieg*, No. 21-CV-577 (BMC), 2023 WL 144112, at *4 (E.D.N.Y. Jan. 10, 2023), aff'd, No. 23-162, 2024 WL 20647 (2d Cir. Jan. 2, 2024) ("as 'numerous ... federal courts have recognized, 'the breach of employer confidentiality policies in order to obtain evidence for a discrimination suit does not constitute protected activity.'"); *see also Frank v. Krapf Grp., Inc.*, No. CV 22-2462, 2024 WL 919836, at *5 (E.D. Pa. Mar. 4, 2024), appeal dismissed, No. 24-1466, 2024 WL 4144402 (3d Cir. Aug. 14, 2024).

## COUNT I
## DEFEND TRADE SECRETS ACT
### *(Harbor Compliance v. Defendants)*

111.    Harbor Compliance incorporates the foregoing Paragraphs of this Complaint as though set forth at length herein.

112.    The DTSA broadly defines the term "trade secret" to include all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing, where: (a) the owner thereof has taken reasonable measures to keep such information secret; and (b) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

113.    Pertinent to this case, Harbor Compliance' trade secrets are comprised of, *inter alia*: (i) financial and sales records, reports, and projections; (ii) current and future pricing models and information; (iii) marketing (including market research data and analytics), business, and expansion plans and strategies; (iv) proprietary software and product development plans and strategies; and (v) customer and prospective customer lists, as well as compilations and analyses regarding customer needs and Services purchased by customers, all of which were acquired and developed at great cost to Harbor Compliance and constitute "trade secrets" within the meaning of that term under the DTSA.

114.    These trade secrets would be difficult, expensive, and time-consuming to duplicate independently, if they could be at all.

115.    These trade secrets are owned by and the exclusive property of Harbor Compliance, have been maintained in secrecy by Harbor Compliance, are not known to the public or within Harbor Compliance's industry and are of great pecuniary value to Harbor Compliance.

116.    Harbor Compliance entrusted its Trade Secrets to Yaghi as its Vice President of Operations and member of the Company's Executive Management Team for the exclusive purpose of benefitting Harbor Compliance.

117.    Harbor Compliance derives independent economic value from its Trade Secrets not being generally known or readily ascertainable by proper means to third parties that could obtain economic value from the use of Harbor Compliance's Trade Secrets.

118.    Yaghi had a duty to refrain from misusing or misappropriating Harbor Compliance' Trade Secrets that were entrusted to him because they are owned by and the exclusive property of Harbor Compliance.

119.    Yaghi breached his duty to Harbor Compliance by intentionally, knowingly, and by wrongful and improper means, misappropriating Harbor Compliance's Trade Secrets for his personal benefit and the benefit of his new business, Compliance Express.

120.    The DTSA expressly authorizes this Court to enjoin Defendants from any actual or threatened misappropriation of Harbor Compliance' trade secrets.

121.    As a direct and proximate result of Defendants' misappropriation of Harbor Compliance' trade secrets, Harbor Compliance has suffered, and continues to suffer, immediate irreparable injury, for which Harbor Compliance has no adequate remedy at law.

122.    In addition to the irreparable injury described above, as a direct and proximate result of Defendants' wrongful conduct, Harbor Compliance has suffered and/or will suffer actual

and/or consequential damages, including loss of competitive business advantage, opportunity, and/or expectancy.

123.    Defendants have acted with wanton, willful, malicious, and/or reckless indifference, and as a result, are liable for punitive damages under the DTSA.

124.    Furthermore, unless Defendants are enjoined from further using and/or disclosing Harbor Compliance' Trade Secrets, the value of a substantial part of Harbor Compliance' business will be irreparably harmed.

## COUNT II
## PENNSYLVANIA UNIFORM TRADE SECRETS ACT
### *(Harbor Compliance v. Defendants)*

125.    Harbor Compliance incorporates the foregoing Paragraphs of this Complaint as though set forth at length herein.

126.    The PUTSA defines the term "trade secret" in substantially the same manner as under the DTSA.

127.    Pertinent to this case, Harbor Compliance' trade secrets are comprised of, *inter alia*: (i) financial and sales records, reports, and projections; (ii) current and future pricing models and information; (iii) marketing (including market research data and analytics), business, and expansion plans and strategies; (iv) proprietary software and product development plans and strategies; and (v) customer and prospective customer lists, as well as compilations and analyses regarding customer needs and Services purchased by customers, all of which were acquired and developed at great cost to Harbor Compliance and constitute "trade secrets" within the meaning of that term under the PUTSA.

128.    These trade secrets would be difficult, expensive, and time-consuming to duplicate independently, if they could be at all.

129.    These trade secrets are the owned by and the exclusive property of Harbor Compliance, have been maintained in secrecy by Harbor Compliance, are not known to the public or within Harbor Compliance' industry and are of great pecuniary value to Harbor Compliance.

130.    Harbor Compliance entrusted its Trade Secrets to Yaghi as its Vice President of Operations and member of the Company's Executive Management Team for the exclusive purpose of benefitting Harbor Compliance.

131.    Harbor Compliance derives independent economic value from its Trade Secrets not being generally known or readily ascertainable by proper means to third parties that could obtain economic value from the use of Harbor Compliance's Trade Secrets.

132.    Yaghi had a duty to refrain from misusing or misappropriating Harbor Compliance's Trade Secrets that were entrusted to him because they are owned by and the exclusive property of Harbor Compliance.

133.    Yaghi breached his duty to Harbor Compliance by intentionally, knowingly, and by wrongful and improper means, misappropriating Harbor Compliance's Trade Secrets for his personal benefit and the benefit of his new business, Compliance Express, of which Yaghi is the owner and Chief Executive Officer.

134.    The PUTSA expressly authorizes this Court to enjoin Defendants from any actual or threatened misappropriation of Harbor Compliance' trade secrets.

135.    As a direct and proximate result of Defendants' misappropriation of Harbor Compliance's trade secrets, Harbor Compliance has suffered, and continues to suffer, immediate irreparable injury, for which Harbor Compliance has no adequate remedy at law.

136.    In addition to the irreparable injury described above, as a direct and proximate result of Defendants' wrongful conduct, Harbor Compliance has suffered and/or will suffer actual

and/or consequential damages, including loss of competitive business advantage, opportunity, and/or expectancy.

137.    Defendants have acted with wanton, willful, malicious, and/or reckless indifference, and as a result, are liable for punitive damages under the DTSA.

138.    Furthermore, unless Defendants are enjoined from further using and/or disclosing Harbor Compliance's Trade Secrets, the value of a substantial part of Harbor Compliance's business will be irreparably harmed.

139.    And, pursuant to Section 503(a) of the PUTSA, the Company is entitled to injunctive relief to prevent that inevitable disclosure of its Trade Secrets based upon: (i) Yaghi's former role and access to Harbor Compliance's most sensitive Trade Secrets as Vice President of Operations and an Executive Management Team Member; and (ii) the undisputed fact that he is now operating a directly competitive business, Compliance Express.

### COUNT III
### UNJUST ENRICHMENT
### *(Harbor Compliance v. Defendants)*

140.    Harbor Compliance incorporates the foregoing Paragraphs of this Complaint as though set forth at length herein.

141.    As a result of Defendants' misconduct, benefits were conferred on Defendants by Harbor Compliance.

142.    As a result of Defendants' conduct as aforesaid, Defendants appreciated said benefits.

143.    As a result of the conduct as aforesaid, it would be inequitable to permit Defendants to retain said benefits without payment of value to Harbor Compliance.

144.    Harbor Compliance seeks substantial damages, the precise amount of which will be determined at trial, including, but not limited to, significant damages tied to unreimbursed expenses and costs, lost profits, and lost opportunities, in the form of the imposition of reasonable royalty or otherwise.

145.    Defendants' conduct has been willful, outrageous, undertaken with reckless indifference to the rights of Harbor Compliance, in bad faith, and with the intent to harm Harbor Compliance for their own competitive advantage.

**COUNT IV**
**UNFAIR COMPETITION**
*(Harbor Compliance v. Defendants)*

146.    Harbor Compliance incorporates the foregoing Paragraphs of this Complaint as though set forth at length herein.

147.    As set forth above, despite having no authority to do so, Defendants retained Trade Secrets and other confidential information belonging to Harbor Compliance for more than five (5) months after the Termination Date, all while Yaghi established a directly competitive business, Compliance Express.

148.    As a result, Defendants gained a "head-start" on establishing a competing business without having to invest any real time and/or money to do so, to Harbor Compliance's detriment.

149.    Further, Defendants have engaged in unfair and deceptive business practices by using Harbor Compliance's non-public and extensive business models and strategies to now offer and market competing services on behalf of Compliance Express.

150.    Defendants' conduct, as detailed above, was and is all intended to provide them with an unfair competitive advantage in the marketplace, and to interfere with the Company's business relationships by improper means.

151.    Defendants' unfair professional and business practices have unjustly minimized Harbor Compliance's competitive advantage and have caused and continue to cause Harbor Compliance to suffer damages.

152.    As a direct and proximate result of Defendants' unfair professional and business practices, Harbor Compliance will continue to suffer irreparable injury, for which Harbor Compliance has no adequate remedy at law.

153.    Due to Defendants' conduct as aforesaid, Harbor Compliance seeks damages in the form of Defendants' profits being disgorged and/or Defendants being required to restore any and all revenues, earnings, profits, compensation, benefits, and rights of attribution that may have accrued to or been obtained by Defendants as a result of their unfair competition, including, but not limited to, returning any revenue earned from the unlawful and unfair use of Harbor Compliance's confidential information and/or Trade Secrets.

154.    Defendants' conduct as aforesaid has been willful, outrageous, undertaken with reckless indifference to the rights of Harbor Compliance, in bad faith, and with the intent to harm Harbor Compliance.

**WHEREFORE**, Harbor Compliance respectfully requests that this Honorable Court enter judgment in its favor and against Defendants, and Order the following relief:

a)    A permanent injunction ordering that: (i) for the life of each of the Trade Secrets, which shall be determined at trial, Defendants, and all other persons or entities acting in concert or participation with Defendants, be permanently enjoined and restrained from soliciting and/or attempting to solicit any Client[12] of Harbor Compliance for the purpose of offering them any

---

[12] As used in this Paragraph, the term "Client" shall be defined to mean any natural person and/or entity that purchased any Service(s) from Harbor Compliance between December 31, 2024 and September 22, 2025, the dates of Yaghi's employment with Harbor Compliance.

products and/or services that compete with the Services; (ii) Defendants, and all other persons or entities acting in active concert or participation with Defendants, be permanently enjoined and restrained from possessing, using, copying, and/or disclosing any Trade Secrets belonging to Harbor Compliance, including, but not limited to, for the purpose of conducting any business on behalf of and/or through Compliance Express; (iii) Defendant return to Harbor Compliance any and all files and materials that contain any Trade Secrets belonging to Harbor Compliance that are within their possession, custody, and/or control; and (iv) Defendants, at their own cost, submit to forensic destruction of any wrongfully obtained Trade Secret information belonging to Harbor Compliance following the disposition of this case.

b)      Compensatory damages, including without limitation lost profits and all damages resulting from Defendants' breaches of their statutory and common law obligations;

c)      An accounting and equitable disgorgement for a payment to Harbor Compliance of all profits and earnings of Defendants' resulting from their misconduct;

d)      Statutory and exemplary damages for violation of the DTSA and PUTSA;

e)      Attorney's fees as provided under the DTSA and PUTSA;

f)      Punitive damages against both Pearson and Compliance Express; and

g)      Such other or further relief as the Court may determine is necessary to provide complete relief for Harbor Compliance resulting from Defendants' violations of law.

## **<u>JURY TRIAL DEMANDED</u>**

Harbor Compliance respectfully requests a trial by jury on all claims so triable.


*[SIGNATURE PAGE FOLLOWS]*

Respectfully submitted,

**ROYER COOPER COHEN BRAUNFELD LLC**

Dated:  March 10, 2026          By:     */s/Marc B. Cytryn*
                                        Marc B. Cytryn (No. 320958)
                                        Aislinn E. Sroczynski (No. 330330)
                                        Three Logan Square
                                        1717 Arch Street
                                        Suite 4700
                                        Philadelphia, PA 19103
                                        484-362-2620 (phone)
                                        484-362-2630 (fax)
                                        mcytryn@rccblaw.com
                                        asroczynski@rccblaw.com

                                        *Attorneys for Plaintiff, Harbor Compliance, LLC*